CHEHARDY, C.J.
Defendant, T.W.D.,[1] appeals his conviction for aggravated rape of a juvenile under the age of thirteen. For the following reasons, we affirm defendant's underlying conviction and sentence of life imprisonment, without benefit of parole, probation, or suspension of sentence, and remand the matter for correction of the hard labor commitment and the Uniform Commitment Order.
Procedural History
On January 14, 2016, a Jefferson Parish Grand Jury indicted defendant, T.W.D., with aggravated rape of a known juvenile wherein the victim was under the age of thirteen, in violation of La. R.S. 14:42. On November 29, 2016, the three-day trial commenced before a twelve-person jury, which unanimously found defendant guilty as charged. On December 5, 2016, after *601 defendant's post-trial motions were denied and defendant waived sentencing delays, the trial judge sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant filed a timely motion for appeal that was granted.
Facts
At trial, S.D., the victim-herein, testified that she was born on June 25, 2003, she was currently thirteen years old, and she was a resident of Carriere, Mississippi. She further testified that defendant was her father's brother.
At trial, S.D. described the initial incident that occurred when she was eight years old. At the time, defendant and his longtime girlfriend, T.P., were visiting the victim and her family at their home in Carriere, Mississippi. The victim was watching television in her room when defendant walked in and began talking with her. S.D. remembered that, all of a sudden, defendant told her to take off her pants. Although S.D. told him, "No," he forced her pants off. She tried to cover herself but defendant uncovered her, unzipped his pants, and took out his "crotch." S.D. wanted to call for help but defendant covered her mouth, slapped her, and told her to "shut up." Defendant then turned her around and pinned her against the bed then inserted his "crotch" into her "crotch."[2] The victim testified that, "[t]hen like it was in there, he didn't move at all." She said that it was painful. He eventually took his "crotch" out and he said, "Tell anyone what happened and I will beat you up." Afterward, defendant walked back to the living room.
The victim was too scared to tell anybody what had happened because she thought that defendant would beat her up. She further stated that defendant abused her other times in that house but she did not remember the details like she did the first time it happened.
The victim recounted another incident that happened when she was eight years old and visiting her grandparents in Louisiana. She and her brother were sleeping in the living room of that house. She was on the floor and her brother was on the couch. Early one morning, at approximately 6:00 a.m., while she and her brother were sleeping, defendant came into the living room and shook her to wake her up. The victim did not wake up so defendant picked her up. When she became aware that defendant was lifting her, she struggled to get out of his grasp because she knew that he was going to abuse her.
That morning, defendant carried S.D. into a shed in the backyard and pinned her over a barrel in the shed. Defendant then took off her pants, unzipped his pants, and inserted his "crotch" inside of her again. When S.D. screamed, he told her to "shut up." The victim recalled that it hurt more than it did when it happened the first time at her house. After it was over, she went back to where she was sleeping and hid underneath her blanket, but she did not tell anyone what happened because she was still scared.
The victim testified that the sexual abuse happened more than one time at her grandparents' house but that those occurrences were mainly in the guest room. She explained that the sexual abuse happened a few times at her grandparents' house in Jefferson Parish, but not as many times as at her house in Mississippi.
The victim also recounted that, one time, her mouth touched defendant's "crotch." She recalled that occurred in the bathroom at her house in Carriere and that she was standing and defendant was sitting on the *602 sink. She stated that it made her feel very uncomfortable and made her gag. The victim stated that she wanted to run away but defendant would not let her.
She testified that defendant made her kiss him a few times on the mouth. She further stated that at some point, defendant's mouth touched her "crotch" and breasts, and that he sucked on her breasts, which made her feel uncomfortable.
The victim testified that she was ten years old the last time defendant "abused her," because that was one of the last occasions that he was allowed at their house. The victim explained that her father banned defendant from their house because defendant tried to hurt her father by running over him with a car after an argument.
S.D. recalled that the first person she told that defendant was "sexually abusing" her was B.D., her mother. S.D. stated that she was on the bus on her way home from school one day when she decided to tell her mother. She explained that she was happy she was not seeing defendant anymore and that she felt better about being able to tell someone what happened. S.D. felt brave enough to tell her mother because they had recently moved and defendant did not know where she lived anymore and could not find her.[3] She believed that she was twelve years old when she made that decision.
When B.D. learned of the abuse, she became very upset.[4] B.D. decided to wait for S.D.'s father, M.D., to get home from work then they went to the police station in Mississippi. The victim gave her initial statement to the Pearl River County Police Department. During that statement, the victim revealed that her uncle had also abused her at her paternal grandparents' house in Jefferson Parish. The Pearl River County authorities advised the victim and her parents that they would need to make a similar report in Jefferson Parish.
Thereafter, the victim met with Detective Judd Harris of the Jefferson Parish Sheriff's Office, and gave a similar statement to the detective outlining the incidents that had occurred. She was subsequently seen by Dr. Jamie Jackson at Children's Hospital in New Orleans and referred for counseling and services to the Audrey Hepburn Care Center. The victim rendered a consistent and detailed account of the abuse to each interviewer.
At trial, the victim's mother, B.D., testified that, in 2009, their family moved into a house in Carriere, Mississippi, where they lived when S.D. was between the ages of eight and ten. B.D. stated that S.D.'s paternal grandparents lived at 5049 Richland in Jefferson Parish when S.D. was between eight and ten years old. B.D. stated that S.D. and her brother spent the night there more than twenty times and sometimes for whole weekends. B.D. testified that defendant mostly lived there. B.D. agreed that, at some point, M.D. banned defendant from their house because defendant and his former girlfriend, T.P., physically fought at their house.
The victim's father, M.D. stated that his parents, and, for a short time, his brother, lived at 5049 Richland. M.D. state that there were two backyard sheds at *603 that address. M.D. described one of the sheds as a fourteen foot by forty foot long shed with two sections. M.D. testified that there were large water barrels and drums stored in the back section. M.D. agreed that he banned defendant from his house because of a violent incident between defendant and defendant's girlfriend.
The victim's parents[5] testified that they have two children, S.D. and A.D., who have both been diagnosed with Asperger Syndrome, an autism spectrum disorder. B.D. noted that S.D. had challenges with social skills at school. She described S.D. as being bluntly honest and very creative. B.D. testified that S.D. loved to draw, create comic books, write stories, and play video games. She said that Japanese animation called "anime" was her favorite thing to draw. B.D. recalled that S.D.'s comic books were fantasy fiction and child-based and did not represent sexual activity or violence.
Dr. Jamie Jackson, who was accepted as an expert in the field of child abuse pediatrics, examined S.D. at the Audrey Hepburn Care Center, which is part of Children's Hospital through LSU in New Orleans. Dr. Jackson testified that S.D. gave a clear history of sexual abuse by defendant involving penile-vaginal, digital-vaginal, and oral-breast contact when she was between eight and ten years old. She testified that S.D. indicated that defendant shoved "his private" into her "private" and that S.D. indicated on a diagram what she was talking about when she said those words. She also testified that S.D. had a normal hymen and that an individual could have a normal hymen even with penile-vaginal penetration.
Further, Dr. Jackson indicated that, for child sexual abuse victims, it is common for there to be an extensive period of time between the incident and the reporting, which was known as delayed disclosure. She further noted that there may be delayed disclosure due to the naivety of young children, internal factors such as embarrassment, shame, or fear, or external factors such as the perpetrator may have threatened her or her family or the perpetrator is someone the child knows well, loves, and/or trusts. Dr. Jackson diagnosed S.D. as having suffered child sexual abuse.
After the State rested its case, defendant's mother, D.D., testified that she did not see the victim and her brother more than once a month and then only with their parents. Further, in the ten years that she lived at 5049 Richland, the victim and her brother might have slept over three or four times. D.D. did not remember a time when the children slept over the same night that defendant slept over. Moreover, D.D. denied that defendant lived with her after 2008.
At trial, defendant testified that, from 2005 to 2010, he lived with his mother at 5049 Richland. Defendant denied sexually assaulting S.D. and denied being alone with her. He further testified that he never inappropriately touched S.D., that he never tried to kiss her, and that he never put his mouth on any part of her body. He admitted that he went over to his parents' house over the last decade and admitted going to visit M.D. and B.D. at their house in Mississippi with T.P. and the children sometimes. Defendant testified that in 2014 at another niece's wedding he interacted with S.D., who ran to him and hugged him.
*604 S.D. testified in rebuttal that she attended her cousin's wedding, but she did not see defendant because he did not attend. S.D. testified that she brought a folder of her drawings with her to court, with some of her "scary" pictures. S.D. maintained that she had never seen grown-ups having sex. She denied witnessing any sexual encounter in real life, on television, in a magazine, or from the internet via a computer, a phone, or other gaming device. S.D. testified that no one told her what to say about defendant.
Law and Argument
On appeal, defendant assigns one counseled and two pro se assignments of error: in his first pro se assignment of error, defendant argues that the evidence presented during trial was not sufficient to convict defendant of aggravated rape beyond a reasonable doubt; and finally, in his first counseled and second pro se assignment of error, defendant argues that it was reversible error for the district court to permit the jury, over defense counsel's objections, to view SD's drawings during its deliberations when these drawings amounted to testimonial evidence, which is specifically prohibited in the Louisiana Criminal Code.
In his pro se brief, defendant argues that the evidence was legally insufficient to support the verdict of aggravated rape.[6] He contends that S.D.'s testimony could not be considered credible to the jury due to the discrepancies, which were presented during the trial. He pointed out that S.D. testified that he had sexually assaulted her on several occasions but that she could not remember what happened during any of those alleged incidents.
Defendant also contends that there was no physical evidence presented to the jury and that a person who had been raped between the ages of eight and ten would have, at a minimum, been missing the hymen. Defendant maintains that although the experts testified that the hymen would have grown back without any scarring, this statement was not supported with evidence.
Defendant also argues that, although Dr. Jackson only met S.D. one time, she was of the opinion that S.D. had been sexually abused by him. He further argues that Dr. Jackson's testimony is inherently unreliable since she testified that she always testifies that the alleged child victim was likely to have been sexually abused.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Neal , 00-0674 (La. 6/29/01), 796 So.2d 649, 657, cert. denied , 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
*605 Defendant was convicted of aggravated rape upon a known juvenile under the age of thirteen, a violation of La. R.S. 14:42.[7] Aggravated rape is defined, in pertinent part, as "a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed ... [w]hen the victim is under the age of thirteen years." La. R.S. 14:42(A)(4)(2014). When the rape involves vaginal or anal intercourse, any sexual penetration, however slight, is sufficient to complete the crime. La. R.S. 14:41(B)(2014). Oral sexual intercourse is defined in pertinent part as the "touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender." La. R.S. 14:41(C)(1). Oral sexual intercourse is also defined in pertinent part as the "touching the anus or genitals of the offender by the victim using the mouth or tongue of the victim." La. R.S. 14:41(C)(2).
In the instant case, S.D. testified that defendant, her uncle, forced her to engage in various sexual acts, including vaginal and oral sexual intercourse, on multiple occasions when she was between the ages of eight and ten. She explained that the incidents occurred at her house in Carriere, Mississippi, and at her paternal grandparents' residence in Marrero, including in a shed in the backyard. Evidence was presented that showed defendant visited both S.D.'s house in Mississippi and his parents' house in Marrero and that S.D. spent time, including overnight visits, at her paternal grandparents' house in Marrero.
S.D. asserted that she did not tell anyone about the sexual abuse right away because defendant threatened to beat her up. She said that she felt it was safe to tell her mother about the sexual abuse when she was twelve years old after her family moved to a ranch, and defendant could not find her. Dr. Jackson, the child abuse pediatrician who examined S.D., testified that it was common for there to be an extensive period of time between the incident and the reporting due to such factors as embarrassment or fear or because the perpetrator may have threatened the child.
On the other hand, defendant testified that he did not sexually assault S.D. and that he was never alone with her. He further testified that he never inappropriately touched S.D., never tried to kiss her, and never put his mouth on any part of her body. Defendant testified that he did not stay overnight at his parents' house after he moved out in 2010.
On appeal, defendant contends that S.D.'s testimony could not be considered credible to the jury due to the discrepancies which were presented during the trial. Defendant notes that the victim stated that he abused her numerous times but only recounted details of two specific events. Our review reveals that S.D. consistently reported the details of the events around defendant's sexual abuse of her to numerous people, including her mother, two police *606 agencies, two child advocacy centers, and at least two medical professionals.
Defendant also contends on appeal that there was no physical evidence presented to the jury. A conviction for aggravated rape may be upheld in the absence of medical evidence. See State v. Roca , 03-1076 (La. App. 5 Cir. 1/13/04), 866 So.2d 867, 875-76, writ denied , 04-0583 (La. 7/2/04), 877 So.2d 143 (this Court affirmed the defendant's convictions for aggravated rape and molestation of a juvenile despite the lack of medical evidence when the victim testified at trial that the defendant forced her to engage in various sexual acts, including the fondling of genitals, sexual intercourse, and oral copulation.)
Defendant further argues that a person who had been raped between the ages of eight and ten would have, at a minimum, been missing the hymen. Defendant maintains that, although the experts testified that the hymen would have grown back without any scarring, there were no clinical studies presented. The record reflects that Dr. Jackson testified that S.D. had a normal hymen and that an individual could have a normal hymen even with S.D.'s sexual history. She explained that was what they saw a majority of the time even with that history. Dr. Jackson further explained that the hymen was like a "donut opening, like a ring," which can remain intact even after penetration and removal.
Our review reveals that S.D. maintained that defendant sexually abused her. Defendant denied doing so. The jury obviously believed S.D. and rejected defendant's testimony. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan , 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion. State v. Robinson , 02-1869 (La. 4/14/04), 874 So.2d 66, 79, cert. denied , 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004) ; State v. Perkins , 11-162 (La. App. 5 Cir. 12/28/11), 83 So.3d 250, 255.
With sexual offenses, the victim's testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Perkins , 83 So.3d at 255 ; State v. Hotoph , 99-243 (La. App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied , 99-3477 (La. 6/30/00), 765 So.2d 1062, and 00-0150 (La. 6/30/00), 765 So.2d 1066.
In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant's conviction of aggravated rape upon a known juvenile wherein the victim was under the age of thirteen. This assignment of error lacks merit.
In defendant's first counseled and second pro se assignment of error, he argues that the trial court committed reversible error by allowing the jury to view S.D.'s drawings during deliberations. Specifically, defendant argues that S.D.'s drawings amount to testimonial evidence because the drawings came from S.D.'s thoughts, feelings, and emotions, all of which she had already testified to during the trial. Defendant also argues that the trial court erred in allowing the jury to review the drawings in the jury room during deliberations because S.D. had written down her thoughts on them, which replicated S.D.'s testimony at trial. Defendant argues that this Court *607 must find that the written portions of the drawings were testimony and improperly allowed in the jury room under La. C.Cr.P. art. 793. He further argues that the trial court's decision cannot be considered harmless error and that this Court cannot say that there is no reasonable probability it might have contributed to his conviction.
The State responds that the trial judge did not err by permitting the jury, during deliberations, to view the drawings made by the victim. The State argues that La. C.Cr.P. art. 793 permits the jury to take with it or have sent to them any object or document received in evidence when a physical examination thereof is required to enable it to arrive at a verdict. The State indicates that the drawings were non-testimonial exhibits, which contained no verbal content and that they did not depict what occurred or any other significant fact. It further responds that the drawings were made by the victim during therapy well before trial and were not reproductions of the victim's statement or testimony, and, therefore, they should not be considered written evidence of testimony within the context of Article 793. The State noted, however, that even if an error occurred, any error would be harmless in light of the evidence introduced at trial.
Our review reveals that S.D. testified at trial that she liked to draw and that she either put her drawings away or displayed them in her room. S.D. testified that she completed different worksheets and drawings with her psychotherapist, which were identified and admitted into evidence as State's Exhibits 12 through 18.
At issue presently is State's Exhibit 18, which S.D. explained at trial. In that exhibit, there are numerous drawings on one page and several written statements. S.D. testified that one of the drawings in State's Exhibit 18 meant that she was worried that if there was not enough evidence, defendant might be found not guilty, which scared her. S.D. stated that another drawing on State's Exhibit 18 was of defendant and that she wrote next to the drawing defendant saying, "I'm going to kill you when I get out of this place." She explained that another drawing on that exhibit showed her committing suicide the day before court.
S.D. testified that in another drawing on State's Exhibit 18, she drew a picture of her step-cousin, D. in a box with bars drawn in front of him, saying, "You're a monster ..." S.D. testified that in that picture D. was upset and mad and she was "kind of scared of him." She asserted that one time at her house in Mississippi when she was eight years old, D. pulled out his "crotch" and made her lick it. She thought that defendant sent him to do it. S.D. stated that this made her feel uncomfortable and sad.
During deliberations, the jury sent the trial judge two notes, one of which stated, "Can we see the drawing (the bottom right hand-the figure S.D. calls D. with bars drawn in front of the figure)?" The trial judge said that she wanted to write a response saying, "The drawing will be provided," noting that was "certainly" within their discretion to view that evidence. The State indicated that was proper. However, defense counsel objected to the jury having the drawing under La. C.Cr.P. art. 793.
Defense counsel argued that the drawing was considered written testimony, but the State disagreed that it was testimonial. The trial judge said she would note defense counsel's objection but that she believed it was proper for the jury to view S.D.'s drawing. Defense counsel pointed out that there was other writing on State's Exhibit 18 and objected to that writing as well as the right-hand corner of that exhibit. After much discussion over the statute, the trial judge, over defense objection, allowed *608 the drawing to go to the jury while they deliberated.
La. C.Cr.P. art. 793(A) provides in pertinent part:
Except as provided in Paragraph B[8] of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
(internal footnote added).
La. C.Cr.P. art. 793 generally prohibits "access to any written evidence" for its verbal content and prohibits the repeating of testimony to jurors during deliberations. State v. Brooks , 01-0785 (La. 1/14/03), 838 So.2d 725, 727 (per curiam). The Louisiana Supreme Court has recognized that jurors may inspect physical evidence in order to arrive at a verdict, but they cannot inspect written evidence to assess its verbal contents. State v. Perkins , 423 So.2d 1103, 1109 (La. 1982).
This Court has found that the general rule as expressed by Article 793 is that the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue, which does not require the examination of the verbal contents of the document. State v. Soler , 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1081, writ denied , 94-1361 (La. 11/4/94), 644 So.2d 1055. The danger that La. C.Cr.P. art. 793 seeks to avoid is that the testimony or written evidence in question will be given undue weight. State v. Miller , 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 198, writ denied , 12-0282 (La. 5/18/12), 89 So.3d 1191, cert. denied , 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013).
In State v. Lyles , 03-141 (La. App. 5 Cir. 9/16/03), 858 So.2d 35, 48-49, the defendant was convicted of two counts of indecent behavior with a juvenile. On appeal, the defendant contended that the trial court erred in allowing the jury to view, during jury deliberations, a diagram drawn by the victim. The defendant also contended that allowing the jury to view the diagram during deliberations was not harmless error.
At trial, the victim drew a diagram depicting the layout of the room in which the offense occurred and the location of other individuals in the room, including the defendant. The diagram was received into evidence without objection. This Court found that unlike a photograph, which was a reproduction of a physical object or scene, the diagram in its case was drawn by a witness/victim in conjunction with her testimony. It asserted that the jury's viewing of the diagram was for its verbal contents, i.e., the victim's testimony regarding the description of the room and its occupants. Therefore, this Court found that the trial court erred in allowing the jury to view the diagram. However, it further found that the error was harmless in that it did not depict what occurred or any other significant fact nor did it bear directly on the element of the crime. This Court noted that the evidence of each element of the offenses was clear.
In the instant case, State's Exhibit 18 is a one-page document that contains *609 several pictures and writing on it. The bottom right hand portion contains the drawing the jury wanted to see, namely, a picture of a person behind bars. Next to that picture is written, "You're a monster..." Above that picture is a drawing of another person, and next to that person is written, "I'm going to kill you when I get out of this place!" In the top right hand corner is a gavel with the words, "Not guilty!" written next to it. In the middle of the page is a drawing of what appears to be a girl, and next to that drawing are the words, "This is all just a bad dream... and you're never waking up!!!" In the top left hand corner is a drawing of a girl with the words, "We didn't gather enough evidence, so we think you have been lying to us and there was no case." Below that picture is a drawing of a person, who it appears has cut marks on her arms. In the bottom left hand corner, there is a drawing of an individual, and there are words next to it stating, "Look at what you've done!!!" At the top of the exhibit in the middle are the words, "Was it because of me? Yeah, it was me..."
In this case, our review reveals that the trial judge erred by permitting the jury to view State's Exhibit 18 during jury deliberations. That exhibit contained numerous writings that duplicated the victim's testimony by written words contained on that page. As such, we find that the jury could have viewed the exhibit for its verbal contents, i.e., the victim's feelings and emotions about defendant wanting to kill her, about going to court, and about committing suicide, which she had testified about at trial. Thus, when the trial judge allowed the jury to view this document with the victim's writings, the jury was allowed "access to ... written evidence" for its verbal content, which is prohibited by La. C.Cr.P. art. 793.
Nevertheless, we further find that this error was harmless in that the exhibit did not depict what occurred during the crimes themselves or any other significant fact nor did it bear directly on an element of the crime. See Lyles, supra. Here, as noted above, without viewing the document in question, a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant's conviction of aggravated rape of a known juvenile under the age of thirteen. Although this argument has merit, any error is harmless.
Errors patent
As is our routine practice, we have reviewed the record for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). We have found that there is an inconsistency between the transcript and the uniform commitment order (UCO). The UCO indicates that the offense date was June 25, 2011; however, the indictment reflects that the dates of offense were on or between June 25, 2011 and June 24, 2014. Also, the transcript of the victim's testimony indicates that the offenses occurred when the victim was between the ages of eight and ten and that her date of birth was June 25, 2003. As such, we remand this matter for correction of the UCO as noted in this errors patent review to ensure accuracy of the record. Further, we direct the 24th Judicial District Court Clerk of Court to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.
Lastly, we note that defendant was not notified of Louisiana's sex offender registration requirements in accordance with La. R.S. 15:540, et seq . Defendant was *610 convicted of aggravated rape upon a known juvenile wherein the victim was under the age of thirteen in violation of La. R.S. 14:42. La. R.S. 15:540, et seq ., requires registration of sex offenders and La. R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirements of La. R.S. 15:542 and La. R.S. 15:542.1 to defendant. The trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification, even where a life sentence has been imposed. See State v. Duong , 13-763 (La. App. 5 Cir. 8/8/14), 148 So.3d 623, 647, writs denied , 14-1883 (La. 4/17/15), 168 So.3d 395 and 16-0073 (La. 8/4/17), 222 So.3d 720 ; State v. Videau , 13-520 (La. App. 5 Cir. 12/27/13), 131 So.3d 1070, 1089, writ denied , 14-0212 (La. 9/12/14), 160 So.3d 965. Accordingly, we remand the matter to the trial court for purposes of providing defendant with appropriate written notice of his sex offender notification and registration requirements, using the form contained in La. R.S. 15:543.1.
Decree
For the foregoing reasons, defendant's conviction and sentence are affirmed. This matter is remanded for correction of the Uniform Commitment Order and hard labor commitment. Additionally, we remand the matter to the trial court to notify defendant of the sex offender registration requirements.
AFFIRMED; REMANDED FOR CORRECTION OF THE UNIFORM COMMITMENT ORDER, HARD LABOR COMMMITMENT, AND SEX OFFENDER REGISTRATION NOTIFICATION

In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim). State v. Ross , 14-84 (La. App. 5 Cir. 10/15/14), 182 So.3d 983, 985 n.3.

She indicated that her "crotch" was what she used to "pee" with in the bathroom.

B.D. verified that their family had moved onto a farm one month before S.D. reported the abuse. M.D., the victim's father, stated that S.D. reported the abuse only after they moved to the ranch because she felt secure because they lived behind a gate and defendant did not know where they lived.

B.D. testified that, on August 26, 2015, S.D. told her that "Uncle T-Bird" touched her breasts and her "private," and touched her with his penis.

M.D. and B.D. have been romantically involved for more than twenty years. Although they have been married, they divorced in 2009. As of the date of trial, the couple had returned to cohabitating for many years.

When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold , 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed before defendant's other assignment. See also State v. Nguyen , 05-569 (La. App. 5 Cir. 2/3/06), 924 So.2d 258, 262.

In 2015, the legislature amended the title of La. R.S. 14:42 from "aggravated rape" to "first degree rape." See 2015 La. Acts No. 184, § 1. As amended, La. R.S. 14:42(E) provides as follows:
E. For all purposes, "aggravated rape" and "first degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape."
In this opinion, we refer to the crime as "aggravated rape" because that is the crime for which defendant was indicted since the acts at issue here occurred before August 1, 2015.

Paragraph B sets forth the law regarding the taking of notes by the jurors, which is not applicable in the instant case.